# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Janet Szajner,                                                      Civil No. 13-2417 (DWF/SER)

            Plaintiff,

v.                                                                      **MEMORANDUM**
                                                                        **OPINION AND ORDER**

Rochester Public Schools, Independent
School District #535, a Minnesota
Municipality; and Judy McDonald, an
individual,

            Defendants.

---

Mark G. Stephenson, Esq., Stephenson & Sutcliffe, PA, attorney for Plaintiff.

John P. Edison, Esq., and Scott T. Anderson, Esq., Rupp, Anderson, Squires &
Waldspurger, attorneys for Defendants.

---

## INTRODUCTION

This matter is before the Court on Defendants Rochester Public Schools,
Independent School District #535 ("the District"), and Judy McDonald's ("McDonald")
(together, "Defendants") Motion for Summary Judgment.  (Doc. No. 12.)  For the reasons
set forth below, the Court grants in part and denies in part Defendants' Motion.

## BACKGROUND

### I.    Plaintiff's Employment

Plaintiff Janet Szajner ("Szajner" or "Plaintiff") began working for the District in 1990 as a "Teens 'N Topics" coordinator for the Community Education program.  (Doc. No. 25 ("Szajner Aff.") ¶ 2; Doc. No. 15 ("Bass Aff.") ¶ 8, Ex. 1.)  Plaintiff's "Teens 'N Topics Coordinator" position later became known as a "Youth Enrichment Coordinator" position (both referred to here as "Coordinator").  (*See* Szajner Aff. ¶ 15, Ex. G.) Plaintiff's work with Community Education evolved over time, but her primary responsibilities involved coordinating and planning Community Education classes, trips, enrichment programs, and other activities for youth living in the Rochester area.  (*See* Doc. No. 17 ("Edison Aff.") ¶ 7, Ex. 63 ("Szajner Dep.") at 15; *see also* Szajner Aff. ¶¶ 26, 27, Ex. L (detailing the duties associated with the Coordinator position in 1997).) The Coordinator duties included acting as the District's Summer of Service ("SOS") coordinator.  (*See* Szajner Dep. at 66, 71.)  Plaintiff's SOS duties included "setting up service projects, . . . hiring staff, training staff, supervising staff, coordinating all aspects of it" and "managing operations or issues that came up."  (*Id.* at 67-68.)  The program ran at Century High School between the 7:30 a.m. and 5:00 p.m. and from 8:00 a.m. to 4:00 p.m., and the SOS students were generally off-site.  (Doc. No. 20 ("Fredin Aff.") ¶¶ 3, 17, Ex. 49 at 10; Szajner Aff. ¶ 26.)

In 1992, Plaintiff signed an agreement entitled "Individual Employment Agreement Nonlicensed Administrative Position," for the Coordinator position ("1992

Agreement"). (Szajner Aff. ¶ 3, Ex. A.) The 1992 Agreement includes provisions relating to the following: (1) the number of days to be worked ("167 . . . duty days per fiscal year for the duration of this Agreement"); (2) the fixed duration of the agreement ("a fixed term of employment commencing on the 1st day of July, 1992, and ending on June 30, 1993, without further notice to either party or any right for continued employment thereafter"); (3) renewal ("The District and the Employee many renew or renegotiate an Individual Employment Agreement for a period following the duration of this Agreement by mutual consent."); and (4) compensation and personnel policies (compensation and personnel policies to be "in accordance with the Statement of Understanding for Off-Schedule employees" and listing the salary for the 1992 to 1993 period). (*Id.*) Each year, until 2011, Plaintiff continued working in the Coordinator position; Plaintiff understood her position to be renewed each year on July 1. (Szajner Aff. ¶¶ 12, 14-16.) Generally, the salary was adjusted either annually or biannually, and Plaintiff signed updated salary "worksheets" when the salary changed. (*See id*. ¶¶ 10, 15, Exs. B-G.)

Plaintiff's position was an hourly, time-sheeted position until 2003 when she became an "Off-Schedule" salaried employee. (Bass Aff. ¶¶ 4, 9, Ex. 2.) The terms and conditions of employment for "Off-Schedule" employees are outlined in a "Statement of Understanding" ("SOU") that is generally issued every two years. (*See* Bass Aff. ¶¶ 2, 10, 11, Exs. 3, 4.) Off-Schedule employee salaries are based on the salary schedule

attached to the SOU.  (*See id.* ¶ 11, Ex. 4.)  In 2011, the governing SOU was effective

from July 1, 2010 to June 30, 2012 (the "2010-11 SOU").  (*See id.*)

As an "Off-Schedule" employee, Plaintiff generally worked on a 7.5 hour per day,

192 day-per-year basis, with the annual work year starting on July 1 and ending on

June 30.  (*See, e.g.*, *id.*)  As Coordinator, Plaintiff did not have set hours and did not

formally report her hours; instead, she typically set her schedule annually with her

supervisor and made sure to meet the required hours for the year.  (*See* Szajner Aff. ¶ 11;

Fredin Aff. ¶ 10; *see also* Szajner Dep. at 92.)  As Coordinator, Plaintiff was allowed to

"flex" her hours to reflect the additional time worked outside of the workday and

accommodate scheduling needs.  (Fredin Aff. ¶ 8; Doc. No. 18 ("Novotny Aff.") ¶ 7;

Doc. No. 19 ("Holm Aff.") ¶ 9.)

For a period, the District allowed Plaintiff, and other employees, to work beyond

the hours permitted for her "Off-Schedule" position and to report the additional hours on

a time sheet.  (Fredin Aff. ¶ 12.)  In 2009, the District informed Plaintiff that she could no

longer work additional hours for the Coordinator position.  (*Id*. ¶¶ 12-13, Ex. 45.)

Plaintiff indicated that she would have to pursue a second job.  (Bass Aff. ¶ 41, Ex. 34 at

Attach. 14; Fredin Aff. ¶ 15, Ex. 47.)  Plaintiff's direct supervisor, Melissa Fredin

("Fredin") responded that Plaintiff was "welcome to get another job of course, none of

my business."  (Fredin Aff. ¶ 15, Ex. 47.)

In February 2011, in addition to her Coordinator duties, Szajner accepted two

part-time positions (0.4 full-time equivalent ("FTE") total) at John Adams Middle School

4

("JAMS") teaching two to three days a week from February 2011 to early June 2011. (Bass Aff. ¶¶ 14-15, Exs. 7, 8; Fredin Aff. ¶ 16, Ex. 48.)  Fredin did not object to Plaintiff taking another position within the District.  (*See* Fredin Aff. ¶ 16, Ex. 48.)

## II.    Plaintiff's Summer 2011 Employment

In July 2011, Szajner testifies that she told Fredin she planned to complete forty internship hours for a master's program by teaching summer school.  (Szajner Dep. at 83-84.)  On April 13, 2011, Plaintiff e-mailed Fredin her tentative calendar for the upcoming year, and, in that e-mail, Plaintiff stated that she would need to do field work in July in the mornings while the SOS students were out at sites.  (Bass Aff. ¶¶ 18, Ex. 11.)  Plaintiff testified that she had three or four discussions with Fredin about having multiple positions and about her schedule for the summer; Plaintiff states that she obtained Fredin's verbal approval to do so.  (Szajner Dep. at 84-86.)

Between July 5, 2011 and July 28, 2011, Plaintiff taught summer school on Monday through Thursday from 9:00 a.m. to 1:00 p.m.  (*See* Bass Aff. ¶ 16, Ex. 9.)  Plaintiff testified that she performed her SOS and other Community Education duties after hours to make up for the time she spent teaching summer school.  (Szajner Dep. at 96-99; Szajner Aff. ¶ 28.)  Plaintiff states that no one complained or expressed concern that her work as Coordinator for the SOS program was not getting done.  (*See* Szajner Aff. ¶ 28; *see also* Bass Aff. ¶ 41, Ex. 34.)

At an August 2011 Community Education coordinators meeting, Kerry Novotny, a Youth Enrichment Coordinator, told Silver, Executive Director of Community Education,

and Fredin that Szajner was being paid to work two District jobs at the same time.

(Novotny Aff. ¶ 3; Doc. No. 16 ("Silver Aff.") ¶ 7; Fredin Aff. ¶ 6.)  Silver then notified

McDonald, Executive Director of Human Resources for the District, about Plaintiff's two

positions.  (Silver Aff. ¶ 9.)  Silver and Fredin state that Szajner never sought their

approval to work both jobs.  (*See* Silver Aff. ¶¶ 6-7; *see also* Fredin Aff. ¶ 19, Ex. 51.)

## III.   Plaintiff's 2011-12 Proposed Employment

On August 4, 2011, Plaintiff e-mailed Fredin with a proposal to reduce her

Community Education hours in order to teach twenty-four hours a week (0.6 FTE) at

JAMS during the 2011-12 school year.  (Fredin Aff. ¶ 20, Ex. 52.)  In August 2011,

Silver e-mailed a response proposal to Plaintiff that provided that Plaintiff could teach at

JAMS and work limited hours as a part-time, hourly employee at Community Education.

(*Id.* ¶ 21, Ex. 53; *see also id.* ¶ 22, Ex. 54.)  Plaintiff would be required to report her

Community Education hours on a time sheet under this proposal.  (*See id.*)  In September,

Silver and Fredin discussed this proposal further with Plaintiff.  (*See* Silver Aff.

¶¶ 11-17.)  On September 14, 2011, Tammy Barrett, from Human Resources, e-mailed

Plaintiff informing Plaintiff that she needed a final decision on the proposal, which

required Plaintiff to resign from her Coordinator position with Community Education;

Plaintiff could not keep both positions as they were.  (Bass Aff. ¶ 22, Ex. 15; Edison Aff.

¶ 11, Ex. 67 ("McDonald Dep.") at 65-68.)  Plaintiff responded:  "I will definitely be

continuing at John Adams and working part-time on a time card at [Community

Education]."  (Bass Aff. ¶ 22, Ex. 15.)

Plaintiff accepted the 0.6 FT teaching position at JAMS on August 26, 2011. (Bass Aff. ¶ 20, Ex. 13.)  The arrangement for continuing Community Education work was not finalized at this time.  (*See* Szajner Dep. at 114.)  Plaintiff began reporting her Community Education hours on a time sheet in September 2011.  (Bass Aff. ¶ 21, Ex. 14.)

On September 15, 2011, Silver and Fredin again met with Plaintiff to discuss her Community Education employment.  (*See* Edison Aff. ¶ 3, Ex. 59.)  When discussing the arrangements, Plaintiff stated that she worked 221 hours in July and August 2011, but did not tell Silver or Fredin at this time that she had worked as a teacher during the summer or that she was not always present at the SOS program between 8:00 a.m. and 5:00 p.m. (*See id.* at 7-8, 11.)

On September 17, 2011, Plaintiff followed-up on the meeting by e-mailing McDonald; in her e-mail, Plaintiff discussed being able to teach without resigning from the Community Education position.  (Bass Aff. ¶ 23, Ex. 16.)  Silver and McDonald set up a meeting to discuss Plaintiff's employment issues.  (*See id*.)

## IV.   Plaintiff's Termination

On September 21, 2011, Plaintiff met with McDonald and Silver to discuss possible avenues for Plaintiff to continue to work for Community Education.  (Edison Aff. ¶ 5, Ex. 61 at 14.)  During this meeting, Plaintiff mentioned that she had taught summer school in July 2011.  (*Id.* at 14.)  Upon hearing this, McDonald called for a break in the meeting.  (*Id.* at 15.)  When the meeting resumed, McDonald notified Plaintiff that

she was the subject of allegations related to claiming payment for working two District

jobs at the same time; McDonald then began to interview Plaintiff as part of a formal

investigation.  (*See generally id.*)  At the conclusion of that meeting, McDonald placed

Plaintiff on paid administrative leave from the teaching position.  (Bass Aff. ¶ 25,

Ex. 18.)  Plaintiff received a "Tennessen Warning" indicating that a complaint was filed

against her for misconduct.  (Bass. Aff. ¶ 24, Ex. 17.)

At the end of September 2011, Plaintiff sent e-mails stating she intended to resign

from Community Education.  (*See* Bass Aff. ¶¶ 27-29, Exs. 20-22.)  The District worked

on an agreement memorializing such a resignation and communicated with Plaintiff

regarding the resignation and a release of claims.  (*See id.* ¶ 29, Ex. 22.)  Plaintiff

expressed concern that she had not been paid for 101 of the 221 hours worked in July and

August 2011.  (*See id.* ¶ 28, Ex. 21.)  Discussions included two options for Plaintiff:

Option A allowed Plaintiff to remain a teacher at JAMS, but resign from her Community

Education position and agree not to bring legal action against the District; and Option B

provided that she would be terminated from both positions for "Gross Misconduct" if she

did not sign an agreement that she would not bring a legal action against the District.

(*See id.*)

In late September 2011, Plaintiff wrote an e-mail to McDonald requesting a

hearing or an opportunity to talk to an administrator regarding the matter and for an

investigation into bullying by the Community Education staff.  (Bass. Aff. ¶ 27, Ex. 20.)

In e-mails, Plaintiff also stated that she would accept "Option A" to "separate [herself]

from a very difficult work environment at [Community Education]." (*See, e.g.*, *id.*)
Plaintiff requested the proposed separation agreement to review. (Bass. Aff. ¶ 29,
Ex. 22.) On October 2, 2011, McDonald told Plaintiff that she was still working on the
Separation Agreement and informed Plaintiff that she could report back to teaching as
soon as McDonald received her signed resignation. (*Id.*)

Also on October 2, 2011, Szajner e-mailed the Rochester Public Schools Board of
Education to explain her situation and request help. (Bass Aff. ¶ 40, Ex. 33.) On
October 12, 2011, Szajner e-mailed McDonald and stated that she "cannot work at
[Community Education] anymore under any circumstances so I will resign of my own
choosing. I am just having a hard time signing the separation agreement and release of
claims when I have not done anything wrong." (Bass Aff. ¶ 32, Ex. 25.) On the same
day, Szajner filed an age discrimination charge against the District with the Equal
Employment Opportunity Commission ("EEOC"). (Bass Aff. ¶ 34, Ex. 27 ("EEOC
Claim").)

In response to the October 12, 2011 e-mail and EEOC claim, McDonald e-mailed
Szajner and stated that "the District considers you to have resigned from your
Community Education position." (Bass Aff. ¶ 33, Ex. 26.) McDonald also stated that
"[t]he District had offered you a separation agreement to which you verbally agreed
pending receipt of the final draft." (*Id.*) McDonald also informed Szajner that no formal
action would be taken pending the mediation with the EEOC claim. (*Id.*) Also on

October 12, 2011, Szajner e-mailed McDonald what she called a formal complaint of age discrimination.  (Bass Aff. ¶ 37, Ex. 30; *see also* Bass Aff. ¶ 41, Ex. 34.)

In October 2011, Plaintiff e-mailed McDonald and the District a number of times inquiring into the terms of her employment at Community Education.  (Bass. Aff. ¶ 39, Ex. 32.)  McDonald informed Szajner that her investigation had determined that "she had reported having worked both in summer school and in SOS simultaneously and that could be subject to discharge."  (McDonald Dep. at 74-75.)  The parties never signed a separation agreement.  (*Id.* at 75.)  Plaintiff requested hearings on a number of occasions. (*See id.*; Bass. Aff. ¶ 43, Ex. 36.)

On March 6, 2011, the Rochester School Board terminated Plaintiff's employment effective September 9, 2011 on the grounds that Plaintiff "has accepted a position as temporary academic skills teacher at [JAMS]."  (Bass. Aff. ¶ 42, Ex. 35.)  That same day, McDonald denied Plaintiff's requests for a hearing on the grounds that she was not being discharged.  (*Id.* ¶ 44, Ex. 37.)

Plaintiff continued working as a part-time teacher at JAMS through the 2011-2012 school year.  (Bass Aff. ¶ 5.)  The District also paid Plaintiff to work for an after-school program between November  2011 and May 2012.  (*Id.* ¶ 51, Ex. 44.)

Plaintiff was paid for 120 of the 221 summer 2011 hours she claims to have worked.  (*Id.* ¶ 46, Ex. 39.)  The District then paid Plaintiff in late March 2012 for 49 of the remaining 101 hours.  (*Id.* ¶¶ 48, 49, Exs. 41-42.)  The District withheld payment for

52 hours on the basis that those hours represented time that Szajner was teaching summer

school during the SOS program.  (*Id.*)

## V.     Plaintiff's Claims

In her Complaint, Plaintiff asserts the following claims:  (1) Violation of

Procedural Due Process under 42 U.S.C. § 1983 (Count I); (2) Violation of Substantive

Due Process (Count II); (3) Defamation (Count III); and (4) Failure to Pay Wages

(Count IV).  (Doc. No. 1 ("Compl.").)  Defendants now move for summary judgment on

all counts.  (*See* Doc. No. 12.)

## DISCUSSION

## I.     Summary Judgment Standard

Summary judgment is proper if there are no disputed issues of material fact and

the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The

Court must view the evidence and the inferences that may be reasonably drawn from the

evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna*

*Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has

stated, "[s]ummary judgment procedure is properly regarded not as a disfavored

procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which

are designed 'to secure the just, speedy, and inexpensive determination of every action.'"

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d

at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.     Federal Claims

### A.     Procedural Due Process (Property Interest)

Under the Fourteenth Amendment, a party has a right to due process of law before deprivation of "life, liberty, or property." U.S. Const. amend XIV, § 1; *see also Christiansen v. W. Branch Cmty. Sch. Dist.*, 674 F.3d 927, 934 (8th Cir. 2012) (characterizing due process and property and liberty interests). However, the constitutional obligation to provide due process applies only when a party has a protected interest at stake. *See Phillips v. State*, 725 N.W.2d 778, 782 (Minn. Ct. App. 2007), *review denied* (Minn. Mar. 28, 2007).

To demonstrate a protectible property interest, an employee must have a legitimate claim of entitlement to continued employment. *See Crews v. Monarch Fire Protection Dist.*, 771 F.3d 1085, 1089 (8th Cir. 2014) (citation and quotation omitted); *McIntire v. State*, 458 N.W.2d 714, 718 (Minn. Ct. App. 1990) (citing *Bd. of Regents v. Roth,* 408 U.S. 564, 577 (1972)) ("To be cognizable, [plaintiff's] due process rights must be based on a protectible property interest in continued employment."). A property interest cannot

stem from a "unilateral expectancy"; rather "[a] property interest stems from an independent source, such as a statute or contract that secures certain benefits and that supports claims of entitlement to those benefits." *Phillips*, 725 N.W.2d at 783 (citations and quotations omitted).

An employee with a fixed term contract[1] or who can show the existence of "mutually explicit understandings" or certain common practices and agreements, can have a legitimate expectation of continued employment. *See Bd. of Regents*, 408 U.S. at 576-78 (examining the fixed term provision of a professor's appointment letter in the context of a procedural due process claim); *Thomsen v. Indep. Sch. Dist. No. 91*, 244 N.W.2d 282, 284 (Minn. 1976) (concluding that the plaintiff had a fixed term contract and was therefore not terminable at will); *Perry v. Sindemann*, 408 U.S. 593, 600-03 (1972) ("A plaintiff may . . . establish a property interest by showing "mutually explicit understanding" or common practices and agreement derived from the employer-employee relationship which would create a sufficient expectancy of continued employment . . ."); *see, e.g.*, *Martin v. Itasca Cnty.*, 448 N.W.2d 368, 370 (Minn. 1989)

---

[1]    In Minnesota, employees and employers may enter into employment contracts for a specified term. *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 628 (Minn. 1983). "These employment contracts—often called "fixed-term" or "term-of-years" agreements—are wholly enforceable." *St. Jude Med. S.C., Inc. v. Biosense Webster, Inc.*, Civ. No. A13-0414, 2013 WL 5508389, at *1 (Minn. Ct. App. Oct. 7, 2013) (citing *Thomsen*, 244 N.W.2d at 284). With a fixed-term employment, an employee must have been terminated for good cause. *Kvidera v. Rotation Eng'g & Mfg. Co.*, 705 N.W.2d 416, 420-21 (Minn. Ct. App. 2005) (citation omitted).

13

(concluding a tenured employee had a legitimate claim of entitlement to continued employment).

To the contrary, employees without an explicit contract are "at will" and can be terminated for any reason; at will employees have no property interest protected by the due process clause. *See Cederstrand v. Lutheran Bhd.*, 117 N.W.2d 213, 221 (Minn. 1962) (outlining at-will principles under Minnesota law); *Pena v. Freeborn Cnty.*, No. A12-2007, 2013 WL 3868086, at *4 (Minn. Ct. App. July 29, 2013) (citing *Rutherford v. Cnty. of Kandiyohi,* 449 N.W.2d 457, 460 n.1 (Minn. Ct. App. 1989)) ("At-will employees have no property interest in continued employment."). [2]

Here, Plaintiff asserts violations of her procedural due process rights based on the alleged deprivation of her property right to continued employment with the District. Plaintiff alleges that her property rights stem from a "contract."  Plaintiff appears to point to two potential "contracts" as the source of her protectible property interest.  First, Plaintiff argues that the 1992 Agreement,[3] in conjunction with what Plaintiff alleges were annual renewals of that contract, establish her property interest in continued employment. Plaintiff appears to be claiming that the 1992 Agreement and renewals constituted "mutually explicit understandings" or "common practices and agreements" or that they

---

[2]      The sufficiency of a claimed property interest in employment may "be created by ordinance, or by an implied contract," but in any event "the claim of entitlement must be decided by reference to state law."  *Bishop v. Wood*, 426 U.S. 341, 344 (1976).

[3]      The document includes Plaintiff's name as the relevant "Employee," but it is only signed by a representative for the District, and not Plaintiff herself.

constitute an ongoing "contract" in a way that shows her legitimate expectation of continued employment.  Second, Plaintiff further appears to assert that, in the alternative, the 2010-12 SOU was a controlling fixed-term contract and that it establishes a one year fixed protectible property interest.  (Doc. No. 28 at 19 ("A written contract for a definite period of time, and serial renewals of that contract OR a practice of entering one year contracts gives plaintiff a property right in that contract.").)

Defendant counters that Plaintiff lacks a protectible property interest because she was an at-will employee who did not have any sort of fixed-term contract or any expectation of continued employment.  The Court agrees and addresses each of Plaintiff's arguments in turn.

First, the Court concludes that Plaintiff's argument that the 1992 Agreement, in conjunction with alleged renewals, constitute some sort of contract or evidence some sort of "mutually explicit understanding" fails as a matter of law.  The plain language of the 1992 Agreement makes clear that the document relates only to the 1992-93 Teen'N Topics Coordinator position, which was solely for a fixed term of July 1, 1992 to June 30, 1993.  (Szajner Aff. ¶ 4, Ex. A.)  The 1992 Agreement further makes clear that the agreement did not automatically renew; instead, it stated that:  (1) "This Agreement shall be for a fixed term of employment . . . , and ending on June 30, 1993, without further notice to either party or any right for continued employment thereafter"; and (2) [t]he District and the Employee may renew or renegotiate an Individual Employment Agreement for a period following the duration of this Agreement by mutual consent."

15

(*Id.*)  Plaintiff thus had no "right for continued employment" after the 1992 Agreement and neither party presents evidence of any subsequent signed "Individual Employment Agreement."  Therefore, the 1992 Agreement cannot be the source of a fixed-term contract for Plaintiff's employment in 2011.

Moreover, the "worksheets" (along with the 1992 Agreement) Plaintiff signed each year, which included her annual salary and other information, did not create a renewed or renegotiated "Individual Employment Agreement" and also did not rise to the level of a "mutually explicit understanding." [4]  The "worksheets" include a general year-long duration (ex. 1992-93), the number of days to be worked, and a salary, but are not clearly marked as an "Employment Agreement" and contain nothing else which could rise to the level of constituting a renewal of an employment agreement.  *Cf. Kvidera*, 705 N.W.2d at 418-19, 421 (finding that a document entitled "Employment Contract" with a variety of terms regarding employment, including title, salary, and vacation plan constituted an employment agreement of a specified duration).

The worksheets also do not establish a definite, ongoing employment agreement. To constitute an ongoing contract where there is no explicit language so stating, there must be "clear and unequivocal language by the employer evidencing an intent to provide job security."  *Gunderson v. Alliance of Computer Prof'ls, Inc.*, 628 N.W.2d 173, 182 (Minn. Ct. App. 2001); *see also Newland v. Connexus Energy*, No. A10-820, 2011 WL

---

[4]  Even if the worksheets could somehow constitute a fixed-term contract, which they do not, the Court notes that Plaintiff fails to provide such a document for the 2010-11 or the 2011-12 term.

206161, at *3 (Minn. Ct. App. Jan. 25, 2011) (citing *Aberman v. Malden Mills Indus., Inc.*, 414 N.W.2d 769, 771 (Minn. App. 1987)) ("To rebut the presumption of at-will employment and establish that the employer could only terminate the relationship for cause, an employee must show that the employer 'clearly intended to create such a contract.'").  The "worksheets" fail to constitute evidence of any such "clear and unequivocal" intent.  Instead, they only outlined the salary associated with the position and the time over which such a salary would be paid.  Neither the fact of the documents themselves nor anything in the record indicates that signing these worksheets in any way guaranteed Plaintiff she would have a position the following year.  At most, Plaintiff had a unilateral expectation that she would be presented with a position year after year, and such an expectation does not create a legitimate expectation of continued employment supporting a constitutionally protected property right.  *See, e.g.*, *Gunderson v*, 628 N.W.2d at 182 (finding that the evidence establishes that plaintiff's employment was for an indefinite term despite verbal assurances of job security and hence was terminable at the will of either party); *see also Geddes v. Nw. Mo. State Univ.*, 49 F.3d 426, 429-30 (8th Cir. 1995) ("[The plaintiff] established at best that she had a unilateral expectation that she would remain in the University's employ."); *Phillips*, 725 N.W.2d at 783-84 (finding that a professor had only a unilateral expectation of continued employment despite regular renewal of his annual appointments and the fact that year after year he selected courses and ordered books for his courses).  In fact, the evidence presented shows that the District considered the position to be at will.  (*See, e.g.*, Bass Aff. ¶¶ 2-3.)

Thus, Plaintiff had what amounts to indefinite employment, which is at-will and does not create a protectible property interest.  *See Geddes*, 49 F.3d at 429-30.

Second, the Court also concludes that Plaintiff's next argument, that the 2010-12 SOU constituted a fixed-term contract, fails as a matter of law.[5]  Obviously, a contract that is for a fixed-term includes a specified duration.  *See, e.g.*, *Thomsen*, 244 N.W.2d at 284 (holding that a contract that explicitly specified the term with dates was a fixed term contract that was only terminable for cause).  For example, if Plaintiff had been terminated between the dates specified in the 1992 Agreement, she would be able to rely on that Agreement as a fixed-term one, requiring cause for termination.  *See, e.g.*, *Cochran v. Chidester Sch. Dist. of Ouachita Cnty., Ark.*, 456 F. Supp. 390, 395 (S. D. Ark. 1978) ("Plaintiff has . . . been clearly deprived of a property interest, the unpaid amount which she would have received under the written contract of employment with the District . . . .").  The 2010-12 SOU, however, did not provide for a fixed term.  Instead, it defined the "annual work year" for any Off-Schedule position working for the District as "July 1 through June 30."  Additionally, it governed the terms of employment for all off-schedule employees; it was not a contract between Plaintiff and the District specifically and, as such, it was not signed by Plaintiff.  Finally, neither the fact that Plaintiff believed she had a fixed-term contract, nor the fact that people in the District

---

[5]     In this case, the Court can make this determination as a matter of law.  *See Dumas v. Kessler*, 380 N.W.2d 544, 548 (Minn. Ct. App. 1986) (stating that "the court was able to determine the intent of the parties as a matter of law by their outward manifestations," and that therefore plaintiff was an at-will employee).

used the term "contract" makes it so.  *See, e.g.*, *Bd. of Regents*, 408 U.S. at 566-69, 578.[6]

Here, there is simply no document for the time period at issue that includes a provision

with a fixed-term that could rise to the level of a fixed-term contract.

In sum, the Court concludes that Plaintiff did not have a fixed-term contract or any

"mutually explicit understanding" that could establish a legitimate expectation of

continued employment.  Thus, Plaintiff was an at-will employee with no protectible

property interest and her due process claim on this basis is dismissed.[7]

### B.      Substantive Due Process or Procedural Due Process (Liberty Interest)

To state a substantive due process claim, Plaintiff must allege the Defendants'

actions in terminating her employment were "sufficiently outrageous" or "truly

irrational" as opposed to "arbitrary, capricious, or in violation of state law."  *Young v.*

*City of St. Charles, Mo.*, 244 F.3d 623, 628 (8th Cir. 2001).  This is a high standard.

*Christiansen*, 674 F.3d at 938.  Substantive due process is concerned with:

> violations of personal rights . . . so severe . . . so disproportionate to the
> need presented, and . . . so inspired by malice or sadism rather than a
> merely careless or unwise excess of zeal that it amounted to brutal and
> inhumane abuse of official power literally shocking to the conscience.

---

[6]       *See also Darke v. Lurie Besikof Lapidus & Co., LLP*, 550 F. Supp. 2d 1032, 1038
(D. Minn. 2008) (explaining that people often misunderstand what it means to have a
contract: "'[A]t-will employment' is not 'employment in the absence of a contract.'
Rather, it is employment under a contract (oral or written) that is not for a fixed term and
that can be terminated by either party.")

[7]       Because Plaintiff has no protectible property interest, the Court does not examine
whether Plaintiff voluntarily resigned or was afforded proper due process or availed
herself of the requisite independent review process.

*Id.* (citing *C.N. v. Willmar Pub. Schs., Indep. Sch. Dist. No. 347*, 591 F.3d 624, 634 (8th Cir. 2010)).  "The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions."  *Id.* at 937 (citing *Bishop*, 426 U.S. at 350).

The basis of Plaintiff's substantive due process claims appears to be that she was falsely charged with certain misconduct, was not specifically informed of the nature of that conduct, and was not given a chance to dispute the charges against her.  Plaintiff appears to further assert that others were notified of those charges in a way that defamed her reputation and interfered with her ability to pursue her career of choice.

Based on these allegations, and viewing the evidence in the light most favorable to Plaintiff, Plaintiff fails to present any facts which could support a claim for violation of her substantive due process rights.  None of the facts as presented by Plaintiff point to actions by the District that were "sufficiently outrageous" or "truly irrational."  Plaintiff alleges that she was wrongly forced out of her position with Community Education and that certain people were told that she was "double dipping" when she worked two district jobs during the summer of 2011.  While Plaintiff perhaps has legitimate issues with the District's decisions, actions, and process relating to the end of her employment in Community Education, they are in no way issues that could be considered to "shock the conscience" as that phrase is legally understood.

To the extent that Plaintiff intends for Count II, "Due Process; Substantive," to be based on a claim that her due process rights to liberty were violated, rather than a

substantive due process claim as outlined above, Plaintiff has also failed to meet her

burden.  A person may claim a liberty interest in continued employment if her "good

name, reputation, honor, or integrity is at stake" during the employment-termination

process in a way that government action imposes on her "a stigma or other disability"

that forecloses her "freedom to take advantage of other employment opportunities."

*Phillips,* 725 N.W.2d at 784 (quotation omitted).  "A public employee has the right to a

name-clearing hearing at a meaningful time if his termination is accompanied by

publication of stigmatizing reasons for his termination that might impair future

employment opportunities."  *Schleck v. Ramsey Cnty.*, 939 F.2d 638, 642 (8th Cir. 1991);

*see also Bd. of Regents*, 408 U.S. at 573.

   To establish a liberty-interest violation, an employee must show that:  (1) the

government used stigmatizing reasons for termination; and (2) that the government made

those reasons public.  *Phillips,* 725 N.W.2d at 784.  The requisite stigma has generally

been reserved for cases in which the employer has accused the employee of "dishonesty,

immorality, criminality, racism, or the like."  *Shands v. City of Kennett,* 993 F.2d 1337,

1347 (8th Cir. 1993) (citation omitted).  The Minnesota Supreme Court has indicated that

"discharge on the grounds of poor performance, poor judgment, incompetence,

unsatisfactory performance, or even insubordination is not stigmatizing."  *Johnson v.*

*Indep. Sch. Dist. No. 281*, 494 N.W.2d 270, 275 (Minn.1992).  Under this standard,

"general allegations of misconduct and insubordination [do] not rise to the requisite level

of constitutional stigma[,]" nor may the stigma "be created by innuendo from inferences

drawn from general allegations of misconduct and insubordination." *Mascho v. Gee,* 24 F.3d 1037, 1039 (8th Cir. 1994) (citation omitted).

Plaintiff argues that she repeatedly attempted to clear her name of the charges that she was double dipping, and that her attempts were rebuffed by the District at every turn. Defendants counter that Plaintiff cannot establish that she was entitled to a name clearing hearing because there is no evidence that the charges made against her were so damaging as to create the requisite stigma and hurdle to employment.  The Court agrees.

Viewed in the light most favorable to Plaintiff, the worst case scenario as presented by Plaintiff is that a discrete number of people were told, and perhaps believed, that she had been "double dipping" when she worked as a teacher and in community education during the summer of 2011.  Plaintiff presents evidence that McDonald determined that she had worked both in summer school and SOS simultaneously and that she no longer trusted that Plaintiff could work in Community Education as a result. (Doc. No. 28 at 18.)  Plaintiff also presents testimony that approximately five employees heard or stated that Plaintiff had been "double dipping" when she worked both jobs, and that perhaps that phrase had been heard "throughout the organization" (referring to Community Education employees).  (*See id*.)  Such allegations fail to support the essential elements of Plaintiff's liberty interest due process claims.  These facts are not stigmatizing as contemplated by Minnesota courts, and were not published to the community at large.  *See, e.g.*, *Peisch v. City of Pequot Lakes*, Civ. No. A04-133, 2004 WL 1834152, at *4 (Minn. Ct. App. Aug. 17, 2004) (concluding that "the information

published about the termination proceedings generally referred to poor performance, poor judgment, personnel conflicts, and insubordination, and therefore, under *Johnson*[, 494 N.W.2d 270 (Minn. 1992)], was not stigmatizing"); *see also McIntire*, 458 N.W.2d at 719 (holding that no liberty interest was implicated in part because "[t]he agency did not inform prospective employers or the community at large of the reason for [plaintiff's] dismissal"). Finally, the publicly stated reason for Plaintiff's termination was that she took another job with the District—this too is not stigmatizing.

Moreover, Plaintiff fails to point to any evidence that any employment opportunities were foreclosed based on the District's actions. *See e.g.*, *McIntire*, 458 N.W.2d at 719 (holding that no liberty interest was implicated in part because "[plaintiff] has not demonstrated that any employment opportunities have been foreclosed by the agency action"). In fact, the District itself employed Plaintiff after knowing of these allegedly stigmatizing facts.

Thus, Plaintiff has failed to establish the violation of either her substantive due process rights or any deprivation of a liberty interest. Count II is dismissed.

**III.   State Claims**

    **A.   Supplemental Jurisdiction**

Plaintiffs' Counts III and IV are state law claims for defamation *per se* and failure to pay wages, respectively. Having dismissed Plaintiff's due process claims, which provided the Court's basis for its original jurisdiction, the Court must decide whether it will exercise supplemental jurisdiction over these remaining state law claims.

In this case, the Court's exercise of supplemental jurisdiction is discretionary. *See* 28 U.S.C. § 1367(c)(3). In deciding whether to remand a case to state court once the basis for federal original jurisdiction has been dismissed, courts consider "factors such as judicial economy, convenience, fairness and comity." *Glorvigen v. Cirrus Design Corp.,* 581 F.3d 737, 749 (8th Cir. 2009) (quoting *Quinn v. Ocwen Fed. Bank FSB,* 470 F.3d 1240, 1249 (8th Cir. 2006)).

Based on the consideration of the pendent jurisdiction factors, the Court concludes that it is prudent to exercise supplemental jurisdiction in this case. Here, the remaining claims for defamation and failure to pay wages (Counts III and IV) are based on the same facts and analysis as already undertaken by the Court. *See, e.g.*, *Pecore v. Jennie-O Turkey Store, Inc.*, Civ. No. 13-1676, 2014 WL 3908628, at *10 (D. Minn. Aug. 11, 2014) (citations omitted) (holding that, based on the relevant factors, "it makes eminent sense to exercise jurisdiction over the [state law] claims since those claims may be disposed of for the same reasons as the [federal] claims—the analysis is identical"). In this case, this is particularly true with respect to the defamation claim which fails based on the same analysis as Plaintiff's liberty interest due process claim. Thus, the Court addresses the remaining state law claims below.

### B.    Defamation *per se*

In order to prevail on a claim for defamation, a plaintiff must prove that: (1) the statement was false; (2) it was communicated to someone besides the plaintiff— publication; and (3) it "tended to harm the plaintiff's reputation and lower him in the

estimation of the community." *See, Keuchle v. Life's Companion P.C.A., Inc.*, 653

N.W.2d 214, 218 (Minn. App. 2002).  Generally, assertions related to an individual's

"business, trade, or profession" are actionable *per se* and do not require proof of actual

damages.  *Id.*

Like with her due process claim, Plaintiff essentially bases her defamation claim

on statements that she was "double dipping."  Specifically, Plaintiff characterizes this as

McDonald accusing Plaintiff "of the crime of theft while suspending and/or terminating

plaintiff."  (*See* Doc. No. 1. at ¶ 35.)

Viewing the evidence in the light most favorable to Plaintiff, she presents no

evidence of publication or that her reputation was harmed.  The Court concludes that no

reasonable juror could find that Plaintiff had been defamed for the reasons stated above

with respect to Plaintiff's liberty interest due process claim.  Accordingly, Plaintiff's

defamation claim (Counts III) is dismissed.

### C.     Failure to Pay Wages

Plaintiff claims that the District has not paid her for the hours she actually worked

during summer 2011.  Whether an employee is discharged or resigns, an employer is

required to pay "wages or commissions actually earned and unpaid."  Minn. Stat.

§ 181.14, subds. 1(a), 2; Minn. Stat. § 181.13(a).

Viewed in the light most favorable to Plaintiff, she presents sufficient evidence based upon which a reasonable jury could find that she is entitled to 52 hours of pay.[8] Plaintiff presents evidence that she worked nights and weekends and successfully and fully completed her duties with the SOS program.  Whether Plaintiff is entitled to payment for those hours is a dispute of material fact.

Thus, Defendants' motion for summary judgment with respect to Count IV, Failure to Pay Wages, is denied.[9]

## CONCLUSION

Plaintiff has failed to establish, as a matter of law, either a protectible property or a liberty interest in continued employment.  Plaintiff has further failed to present sufficient evidence upon which a reasonable jury could find that Defendants' actions "shock the conscience" in a way that could support a substantive due process claim.  Although the Court has dismissed all federal claims in this matter, the Court exercises supplemental jurisdiction over the remaining state law claims based on the relevant factors of "judicial economy, convenience, fairness and comity."  Plaintiff's defamation claim fails for the same reason as her liberty interest due process claim.  However, Defendants' motion as it relates to Plaintiff's Failure to Pay Wages claim is denied based on sufficient evidence to

---

[8]    The Court agrees with Defendant that the evidence shows that the amount of unpaid wages in dispute is 52 hours.  (*See* Doc. No. 13 at 13.)

[9]    The Court agrees with Defendants that Plaintiff's failure to pay wages claim against McDonald must be dismissed as such a claim must be brought against an employer, not an individual.  *See* Minn. Stat. § 181.171, subd. 1.

show a genuine issue of material fact.  The Court adds that in light of the nature of the

remaining claim, settlement is likely in the best interests of the parties in this matter.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. [12])

is **GRANTED IN PART and DENIED IN PART** as follows:

1.     The Motion is **GRANTED** with respect to Counts I, II, and III, which are

**DISMISSED WITH PREJUDICE**; and

2.     The Motion is **DENIED** with respect to Count IV.


Dated:  February 13, 2015                    s/Donovan W. Frank
                                             DONOVAN W. FRANK
                                             United States District Judge